FILED

2015 May-11  PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| GENNIE V. BYRD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  7:14-cv-01469-TMP |
| | ) | |
| D.A. JONES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| BRIDGET BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  7:14-cv-01537-TMP |
| | ) | |
| LENORA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

These two cases, originally filed by separate plaintiffs, were consolidated by the court on September 25, 2014, because both cases involve the same series of events arising out of the disputed custody of a minor child.  Now pending before the court is a Motion for Summary Judgment by defendants David A. Jones,

Dornell Cousette, and the City of Tuscaloosa,[1] filed October 7, 2014, (doc. 17),[2] which was joined by defendant Smith (doc. 32) on November 25, 2014.  Also pending are Motions to Strike the affidavits of defendants Jones and Cousette by the plaintiffs in <u>Byrd I</u>.[3]  (Docs. 36, 37).  The motions have been fully briefed.  The parties have consented to the exercise of dispositive jurisdiction by the undersigned (doc. 44).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

---

[1]  This motion originally was filed as a Motion to Dismiss, but was converted to a Motion for Summary Judgment by the court because additional materials have been offered in support of the motion. (Doc. 31).

[2]  Unless otherwise specified, all document numbers are taken from the lead case, <u>Byrd v. Jones, <i>et al.</i></u>, Case No. 7:14-cv-01469-TMP.  For purposes of clarity, hereinafter the lead case, Case No. 7:14-cv-01469-TMP, will be referred to as <u>Byrd I</u>, and the member case, Case No. 7:14-cv-01537-TMP, will be referred to as <u>Byrd II</u>.

[3]  The Byrds argue that the affidavits of the two police defendants are hearsay or otherwise inadmissible because the information related in them is not based on the officers' personal knowledge.  To the extent the statements objected to in the motions were offered to prove the truth of the matters asserted, it is true that such would be inadmissible hearsay.  However, the motions to strike (docs. 36, 37) are due to be and hereby are DENIED because the affidavits reflect the information possessed by the officers, whether true or not, at the time they acted to apply for arrest warrants.  Police officers may base assessments of probable cause on hearsay and may seek arrest warrants on the basis of hearsay.  What the officers believed at the time they sought the arrest warrants is crucial to the issue of whether they had at least arguable probable cause to seek the warrants.  The court will consider the affidavits, therefore, only to the extent they are offered to show what officers Jones and Cousette thought to be probable cause to seek arrest warrants.

party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial,"  Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379

(5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).  Utilizing these standards, the court undertakes the analysis

of whether the defendant has shown that it is entitled to judgment as a matter of law.

## FACTS

The facts, taken in the light most favorable to the non-moving plaintiffs, are as follows.  Bridget Byrd (the original plaintiff in Byrd II), a resident of Michigan, is the mother of two minor children, B.B. and B.B.'s brother.  In the summer of 2011 Bridget Byrd's mother and step-father, defendants Lenora and Samuel Williams ("the Williamses") picked up B.B. and her brother from Bridget Byrd's home in Michigan for what Bridget Byrd believed to be a summer visit.  The Williamses brought B.B. and her brother to their home in Tuscaloosa, Alabama, with Bridget Byrd's consent.  In July 2011, Bridget Byrd gave her father and step-mother permission, plaintiffs Lamond and Gennie Byrd ("the Byrds" are the original plaintiffs in Byrd I), to retrieve B.B. and her brother from the Williamses' home and return them to Michigan for a funeral.  The Williamses allowed B.B.'s brother to return to Michigan, but did not allow the Byrds to take B.B.

Controversy over the custody of B.B. has existed for some time.  In 2003, a Michigan probate court appointed Bridget Byrds' mother, defendant Lenora Williams, as the guardian of B.B.  (Doc. 17-1).  The docket sheet from the Michigan court, annexed as an exhibit to the Byrds' complaint, shows that a

petition to terminate the guardianship was filed in October 2005, but the hearing to address the petition was "put on hold" because "visitation agreement already worked out."  (Exhibit to Amended Complaint in Byrd I, Doc. 23-1, p. 2).  In July of 2006, the docket sheet noted the "case [was] closed."  On July 7, 2006, a letter was mailed to Lenora Williams from the Michigan probate court, stating:

> A review of the court's file in this matter indicates that you, as the Guardian for the ward and the ward himself have recently moved outside the State of Michigan.  The purpose of this letter is to inform you that you have one (1) month from today to establish a guardianship in your new community before the present guardianship here in Washtenaw County is administratively closed.  Unfortunately, Letters of Guardianship issued in the State of Michigan are only valid as long as the individual is a resident of the state.

(Exhibit to Amended Complaint in Byrd I, Doc. 23-1, p. 4).  And, indeed, on July 10, 2006, the docket sheet indicates that the "CASE [was] CLOSED."  (Id. at p. 2).

Five years later, an entry on the docket sheet of the Michigan proceeding dated September 8, 2011, stated:

> MOTHER CAME IN TO COURT LOOKING FOR ORDER TERMINATING GUARDIANSHIP INFORMED HER THAT THE CASE WAS ADMINISTRATIVELY CLOSED AND AT THAT TIME ORDERS WERE NOT PREPARED FOR ADMINISTRATIVE CLOSURES.  TOLD HER THAT i WOULD BE HAPPY TO SPEAK WITH HER CONTACT IN TUSCALOOSA

COUNTY PROBATE COURT TO INFORM HER OF THE STATUS HERE.

(Exhibit to Amended Complaint in <u>Byrd I</u>, Doc. 23-1, p. 2)[4] (all as in original).

A year later, in the summer of 2012, the controversy moved to Tuscaloosa County. On July 3, 2012, Bridget Byrd talked with defendant Cousette at the Tuscaloosa Police Department to obtain assistance in getting custody of her daughter from her mother. (Cousette Affidavit, Doc. 35). She showed Cousette a "Withdrawal of Parental Guardianship" petition filed in the Probate Court of Tuscaloosa County the day before (Doc. 19-1, ¶ 5), and she showed him "a letter from the court in Michigan" showing that Lenora Williams's guardianship of B.B. was terminated years before. (Bridget Byrd Affidavit, Doc. 20-1, ¶ 3). Cousette understood the Tuscaloosa petition to indicate that court proceedings had begun to gain custody of the child.[5] (Cousette Affidavit, Doc. 35). Officer Cousette

---

[4]    The contents of the docket sheet fit hearsay exceptions under FRE 803(6) as a record of a regularly conducted activity and FRE 803(8) as a "public record." As the plaintiffs themselves attached the docket sheet in support of their complaint, its authenticity cannot be challenged by them. <u>Cf.</u> <u>Wells v. XPEDX</u>, 2007 WL 2696566, *4 (M.D. Fla. 2007) (a document produced by a party in discovery is "deemed authentic" when offered by a party opponent).

[5]    After these events, the Alabama Court of Civil Appeals made the following finding of fact in September 2014, which is binding on Bridget Byrd and Lenora Williams as parties in that matter:

On July 5, 2012, the mother filed an emergency petition in the trial court seeking a writ of assistance and delivery of the child to her. The mother also filed in the Tuscaloosa Probate Court ("the probate court") a withdrawal of parental guardianship in which she withdrew her consent to the legal guardianship of the grandmother over the child, and, additionally, she filed in the probate court a

advised Bridget Byrd to allow the court proceedings to work.  (Id.)  Later that day, Cousette received a report from another officer, stating that Bridget Byrd had gone to the home of the Williamses, unsuccessfully seeking to get the child.  Over the next several days, Cousette told Bridget Byrd that he had spoken with Lenora Williams, who confirmed that B.B. had been living with Bridget Byrd in Michigan for four years prior to the summer of 2011.

A month later, on August 6, 2012, Officer Cousette received a police dispatch regarding an alleged kidnapping at a restaurant.  Responding to the dispatch, he interviewed defendant Lenora Williams, who told him that Bridget Byrd and Lamond and Gennie Byrd took B.B. from the Williamses' custody during an agreed visitation at a restaurant.  She said that Lamond Byrd grabbed the

---

certificate of appointment of guardian in which she appointed L.B., the child's maternal grandfather ("the grandfather"), as guardian of the child.

* * *

The grandmother [Lenora Williams] filed an answer to the mother's emergency petition and a counterclaim in the trial court on August 3, 2012, in which she alleged that the mother had physically abused the child and that it was in the child's best interest for custody to be awarded to the grandmother.

* * *

It is undisputed that the child had returned to Michigan to live with the mother in April 2007.  It is further undisputed that the child had come to Alabama in June 2011 with the mother's permission to visit the grandmother with the intention of returning to Michigan in August 2011.

(Bridget Byrd Aff., Ex. B, Doc. 20-2).

child in the restaurant parking lot and ran to a vehicle being driven by Bridget
Byrd.  Gennie Byrd was a passenger in the car, according to Mrs. Williams.  After
the Byrds left with B.B., they returned to Michigan and the Williamses contacted
the Tuscaloosa Police Department.  Mrs. Williams complained that B.B. had been
unlawfully removed from her custody.  She explained to him that, at a hearing
earlier that day, an Alabama judge had found Bridget Byrd's petition for custody
of B.B. to be "improper."  She gave Officer Cousette the cellphone numbers for all
three Byrds, and he attempted unsuccessfully to contact them several times that
day.  The next day, August 7, 2012, Officer Cousette telephoned Bridget Byrd,
who confirmed that she had B.B. and would not return her to Alabama.  (Doc. 35,
p. 4).  Cousette asked Bridget Byrd for the telephone number of the probate court
or judge in Michigan who had presided over B.B.'s case.  (Doc. 20-1, ¶ 8).

As an investigator in the Juvenile Division of the Tuscaloosa Police
Department, defendant David A. Jones also received a report of the August 6
incident.  In an incident report prepared by Officer Sanders (who is not a defendant
in this action), it was reported as follows:

> Officers responded to the parking lot of Ryan's Steakhouse and spoke
> with Mr. Williams.  He advised that he is married to Lenora Williams
> who has legal custody of [B.B.].  [B.B.] is the biological grand-
> daughter of Lenora Williams.  He stated that Bridget Byrd, the child's
> biological mother; and Lemond [sic] Byrd, the child's biological
> grandfather and Lenora Williams' ex-husband were invited to the

restaurant for a supervised visitation with the child.  He stated that Mr. Byrd grabbed the child in the parking lot and ran to his black chevy [sic] car and forced her inside.  Bridget Byrd was already in the car with it running.  Both Mr. and Mrs. Williams attempted to stop the kidnapping and reached into the cars' [sic] back doors which were still open to try and get the child out.  Bridget Byrd spead [sic] away with both of the Williams subjects still partially inside the car.  Ms. Williams was ran [sic] over according to the witnesses.  Both witnesses also advised that the car was a newer model Chevy Impala with Michigan plates.  She was transported to DCH by Rescue Truck 27 for treatment.  Officers informed SGT Huff of the kidnapping and YA [Youth Aid] was also notified.  Officers got written statements from the two witnesses.  Investigator Cousette from Youth Aid responded.

(Doc. 34, p. 7).[6]   Based on this report and "other information learned by the Juvenile Division,"[7] Investigator Jones "prepared depositions" to be presented to a magistrate of the Tuscaloosa County courts, Rosina Smith.  In the complaint filed by Investigator Jones against Gennie Byrd, he alleged under oath the following:

> [W]ithin twelve months of the commencement of this action, and within said county, the defendant, GENNIE BODDIE BYRD, who is otherwise unknown to the complainant did commit the offense of Interference with Custody in that the said defendant did on or about AUGUST 6TH ,2012 @ 4373 COURTNEY DR,TUSCALOOSA, AL 35401 interfere with with [sic] [B.B.] custody by knowingly taking or enticing [B.B.] who is under the age of 18 from the custody of its

---

[6]   Once again, to be clear, the court does not consider this report or the information in it for the purpose of proving the truth of the matters recorded it in, but simply as evidence of what Defendant Jones believed the facts to be, regardless of whether, in fact, they were true.

[7]   The nature of this "other information" is not revealed, but one may conjecture that it includes the conversations Officer Cousette had with Bridget Byrd in early July 2012 and knowledge of the filing of the emergency petition for custody on July 5, 2012, which she showed him.

parent, guardian or other lawful custodian who is SAMUEL AND LENORA WILLIAMS To wit: THE DEFENDANT HELD THE DOOR OPEN FOR THE CO-DEFENDANT AS HE FORCED THE CHILD/VICTIM ([B.B.]) INTO THE VEHICLE. THE CHILD IS 10 YEARS OF AGE AND WAS TAKEN DURING A SUPERVISED VISITATION WITH THE WITNESSES SAMUEL WILLIAMS AND LENORA WILLIAMS WHO ARE THE LEGAL CUSTODIANS OF THE CHILD. in violation of Section 13A-6-45 [Code] of Alabama, 1975, against the peace and dignity of the State of Alabama.

(Exhibit to Complaint in Byrd I, doc. 1-2). The complaints against Bridget Byrd and Lamond Byrd are substantially similar in their description of the child being taken from the parking lot of the restaurant and the assertion that Lenora Williams was the lawful custodian of the child. (See Exhibits annexed to Complaint in Byrd II, Doc. 1). Based on these complaints by Jones, Magistrate Smith issued felony arrest warrants for each of the three Byrds based on a charge of interference with custody that same day, August 6, 2012. (Id.) Bridget Byrd was arrested in Michigan on August 7, 2012, pursuant to the warrant, and was imprisoned in the Washtenaw County Jail for ten days. On or about August 17, 2012, the State of Alabama withdrew the charges against Bridget Byrd,[8] and she was released from jail. On August 9, 2012, Lamond and Gennie Byrd also were arrested after turning

---

[8]    There is no explicit indication in the record why the charges were withdrawn. However, on August 7, 2012, the day Bridget Byrd was arrested, the clerk of the Michigan probate court wrote a letter "To whom it may concern," noting that the guardianship of B.B. by Lenora Williams was "closed" in 2006 when she and B.B. moved out of Michigan. (See Exhibit to Amended Complaint, Doc. 23-1, p. 1). The letter was certified by the probate judge of the court.

themselves in to authorities in Tuscaloosa, Alabama.[9]  Ultimately, the case against the Byrds also was dismissed.

In September 2014, two years after these events, the Alabama Court of Civil Appeals found that Lenora Williams's custodial rights to B.B. expired in 2006, when her Michigan guardianship expired after she moved out of state.  The court also concluded that Alabama courts have no jurisdiction over the question of the custody of B.B.  (Bridget Byrd Affidavit, Ex. B, Doc. 20-2).

## DISCUSSION

Defendants Jones and Cousette assert in the Motion for Summary Judgment that they are entitled to qualified immunity and state agent immunity, and the City of Tuscaloosa asserts direct and derivative immunity.  (Doc. 17, pp. 14, 16).  In her joinder of the Motion for Summary Judgment, defendant Smith asserts that she is entitled to judicial immunity with regard of each of the claims against her.  (Doc. 32, p. 2).  Because different types of immunity may be applicable to different defendants, the defendants, along with their potential immunity, will be addressed separately.

---

[9]     The Amended Complaint alleges that Officer Cousette telephoned Gennie Byrd on August 9, 2012, to inform her that a warrant for her arrest had been issued for interference with custody.  (Doc. 23, ¶ 5).  She and Lamond Byrd then turned themselves in to Tuscaloosa authorities, but it is not clear who actually placed them in physical custody.

**Defendant Smith**

Defendant Smith is a magistrate for the District Court of Tuscaloosa County, Alabama.  She is named as a defendant only in <u>Byrd II</u>, and joined defendants Jones, Cousette, and the City of Tuscaloosa in the pending Motion for Summary Judgment on November 25, 2014.  (Doc. 32).  Bridget Byrd, the plaintiff in <u>Byrd II</u>, sets out the following counts in her complaint:

*Count I* – Violations of 42 U.S.C. § 1983 in the form of false arrest, false imprisonment, malicious prosecution, violation of her right to freedom of association under the 1st Amendment, violation of her right to be free from cruel and unusual punishment, violation of her right to due process and equal protection under the 14th Amendment, and violation of her right to care for her own child;

*Count II*[10]  – Alabama state law claim of intentional infliction of emotional distress;

*Count III* – Alabama state law claim for false arrest;

*Count IV* – Alabama state law claim for false imprisonment;

*Count V* – Alabama state law claim for defamation;

*Count VI* – Alabama state law claim for malicious prosecution;

*Count VII* – Alabama state law claim for negligent infliction of emotional distress;

*Count VIII* – Violation of 42 U.S.C. § 1985(3) for conspiracy to deprive a person of rights and immunities under law, including the right to free association, freedom from cruel and unusual punishment, right to interstate travel, equal

---

[10]     The Complaint in <u>Byrd II</u> erroneously denominates the second count as "Count I – Intentional Infliction of Emotional Distress."

protection and due process of law, and freedom from illegal search and seizure; and

*Count IX* – Alabama state law claim for felonious injury/interference with custody under Alabama Code § 6-5-370 (1975).

The plaintiff in Byrd II does not specify which claims she intends to bring against each defendant.[11]  Therefore, the court presumes that each of the claims is asserted against all defendants.  Smith is entitled to absolute judicial immunity as to all of the claims in the complaint.

### A. *Federal Claims*

To the extent the plaintiff alleges that Magistrate Smith, acting in her official capacity as a magistrate, improperly issued an arrest warrant for Bridget Byrd, Smith was acting as an Alabama state official, entitled to the same immunity as the state itself from any federal-court judgment imposing a duty to pay money.  Indeed, suing Smith in her official capacity is nothing more than suing the State of Alabama, which is barred by Eleventh Amendment immunity.  See Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 611 (1978).

---

[11]    The Complaint is an example of a "shotgun pleading," repeatedly condemned by the court of appeals in many cases.  The complaint fails to specify which counts are pleaded against what defendants, or to identify the facts each defendant is alleged to have engaged in that gives rise to potential liability under each count.  Plainly, not every count applies to every defendant.  For example, there is no allegation that the Williamses swore to the complaint against Byrd or were otherwise involved in her actual arrest in Michigan, yet they are named as defendants in the false arrest/false imprisonment and malicious prosecution counts.   Each succeeding count incorporates the allegations of all previous counts, thereby incorporating into each count multiple theories of liability that have nothing to do with the subject of the count.

There is no allegation that Smith was acting in any capacity other than as a magistrate, and indeed, absent that authority, she could not have entered an arrest warrant.

Assuming, however, that the plaintiff in <u>Byrd II</u> is attempting to sue Smith in her *individual* capacity, Smith is entitled to judicial immunity. The plaintiff alleges that Smith used her authority as a magistrate to issue an arrest warrant against her. There is no allegation that Smith is not a magistrate or that she did not have jurisdiction over the matter about which the warrant was issued. There is a long line of Supreme Court cases recognizing the absolute immunity of judges from damages against them personally for actions taken in their capacity as judge. <u>See</u> <u>Stump v. Sparkman</u>, 435 U.S. 349, 98 S. Ct. 1099, 55 L. Ed 2d 331 (1978); <u>Pierson v. Ray</u>, 386 U.S. 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967); <u>Mireles v. Waco</u>, 502 U.S. 9, 112 S. Ct. 286, 287, 116 L. Ed. 2d 9 (1991). The immunity afforded to judges protects them from having to defend a lawsuit, as well as from the ultimate assessment of damages. <u>Mireless v. Waco</u>, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991), citing <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411(1985). A judge loses her immunity in only two circumstances:

> First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. *Forrester v. White*,

> 484 U.S., at 227-229, 108 S. Ct., at 544-545; *Stump v. Sparkman*, 435
> U.S., at 360, 98 S. Ct., at 1106.  Second, a judge is not immune for
> actions, though judicial in nature, taken in the complete absence of all
> jurisdiction.  *Id*., at 356-357, 98 S. Ct., at 1104-1105; *Bradley v.
> Fisher*, 13 Wall., at 351.

Mireles v. Waco, 502 U.S. 9, 11-12, 112 S. Ct. 286, 288, 116 L. Ed. 2d 9 (1991).

Neither of these circumstances is alleged here.  The plaintiff unmistakably alleges

that Smith, acting in her capacity as a magistrate, issued the arrest warrant for the

plaintiff, and there is no assertion that Smith lacked jurisdiction to do so.      This

absolute judicial immunity extends to Alabama magistrates, such as Smith, who

are performing judicial functions.  See Ex parte City of Greensboro, 948 So. 2d

540, 542-43 (Ala. 2006).  Plainly, reviewing complaints for probable cause and

issuing arrest warrants is a judicial function.  Accordingly, all federal claims

asserted against Smith by the plaintiff in Byrd II are due to be dismissed.

### B. State Law Claims

Alabama law also grants Smith absolute judicial immunity.  The Supreme

Court of Alabama made clear in City of Bayou La Batre v. Robinson that judicial

immunity extends "to the discretionary judicial acts of magistrates."  785 So. 2d

1128, 1133 (Ala. 2000), citing Almon v. Gibbs, 545 So. 2d 18, 20 (Ala. 1989)

("[W]here a clerk of court is performing a duty that requires the exercise of

judgment and discretion in its performance, it is considered a judicial act entitling

the clerk to judicial immunity.   This absolute immunity for acts within the jurisdiction of the judicial officer is extended even where the officer acts in error, maliciously, or in excess of his authority.")   Accordingly, all state law claims asserted against Smith by the plaintiff in Byrd II also are due to be dismissed.

## Defendants Cousette and Jones

Federal claims against defendants Cousette and Jones are asserted in both Byrd I and Byrd II.   The plaintiffs in Byrd I and Byrd II assert federal claims pursuant to 42 U.S.C. § 1983 and (in Byrd II) § 1985(3).   Defendants Cousette and Jones, at all relevant times, were police officers for the Tuscaloosa Police Department and, therefore, were state actors for purposes of claims asserted under 42 U.S.C. § 1983.   In Byrd I and Byrd II the plaintiffs assert under § 1983 claims of false arrest, false imprisonment, and malicious prosecution in violation of the 4th and 14th Amendments.   In Byrd II, Bridget Byrd also asserts federal claims under § 1983 for interference with her First Amendment right to freedom of association, her Eighth Amendment right to be free from cruel and unusual punishment,[12] her

---

[12]   Any claim grounded on the Eighth Amendment is clearly meritless because Bridget Byrd was never convicted of any offense.  The Eighth Amendment applies only to the rights of convicted prisoners.  "The eighth amendment, however, applies only to confinement that occurs subsequent to and as a consequence of a person's lawful conviction of a crime."   Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985), citing Ingraham v. Wright, 430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977).  This claim will be DISMISSED WITH PREJUDICE.

Fifth[13] and Fourteenth Amendment rights to due process and equal protection, and her fundamental right to parental care and custody of her minor child.[14]  She also asserts a conspiracy claim pursuant to 42 U.S.C. § 1985(3), alleging that defendants conspired to deprive her of all of these rights.

The claims against the defendants are brought pursuant to events occurring in two distinct chronological periods – before the arrest warrants were issued, and after.  The plaintiffs' claims of malicious prosecution must arise from the *seeking* of the arrest warrants, whereas the claims of false arrest and false imprisonment can pertain only to actions taken *pursuant* to the arrest warrant.  The distinction is of paramount importance because whether there was a facially valid warrant in place determines whether the defendants may be entitled to absolute quasi-judicial immunity or to qualified immunity.

### A. Quasi-Judicial Immunity

The Eleventh Circuit has determined that "law enforcement personnel, acting in furtherance of their official duties and relying on a facially valid court

---

[13]    Any claim grounded on the Fifth Amendment is meritless because the due process and equal protection rights of that amendment apply only against federal officials, not state officials as are sued in this case.  "[T]he Due Process Clause of the Fifth Amendment applies only to conduct committed by officials of the federal government; it does not apply to state actors." McCall v. Dep't of Human Resources, 176 F. Supp. 2d 1355, 1363 (M.D. Ga. 2001), citing Riley v. Camp, 130 F.3d 958, 972 n. 19 (11th Cir. 1997) (Tjoflat, J., dissenting from the denial of rehearing *en banc*).  Her Fifth Amendment claim will be DISMISSED WITH PREJUDICE.

[14]    The court assumes this is the basis for her reference to the Ninth Amendment.

order, are entitled to absolute quasi-judicial immunity from suit in a section 1983 action." <u>Roland v. Phillips</u>, 19 F.3d 552, 556 (11th Cir. 1994).  Therefore, actions taken in effectuating the arrest warrant once it had been issued are protected by absolute quasi-judicial immunity.  The plaintiffs may argue that, because the charges against the plaintiffs in <u>Byrd I</u> and <u>Byrd II</u> ultimately were dismissed, the arrest warrant was not valid, removing the shield of quasi-judicial immunity. Immunity is not so easily lost, however.  A warrant does not have to be correct, or even lawful, to be facially valid.  <u>Roland</u>, 19 F.3d at 556.  The fact that the charges upon which the warrant was issued later were found to be erroneous, does not signal that the warrant was facially invalid at the time it was executed.  Because the arrest warrants pursuant to which the plaintiffs were arrested were facially valid, the officer who arrested the plaintiffs is entitled to quasi-judicial immunity in regard to the claims of false arrest and false imprisonment in <u>Byrd I</u> and <u>Byrd II</u>. Likewise, to the extent that officer also is sued under the First Amendment on the theory that the arrest interfered with Bridget Byrd's freedom of association with her child, or under the Ninth Amendment for interfering with her fundamental right to the custody of her child, quasi-judicial immunity protects the arresting officer.

In <u>Byrd I</u>, the plaintiffs assert claims of false imprisonment and false arrest against both defendants Jones and Cousette.  However, the complaint in <u>Byrd I</u> states that defendant Cousette arrested the Byrds.  (Doc. 23, ¶ 5).  The Complaint

does not allege that Jones was present when the arrests took place.  Because defendant Jones did not actually arrest any of the plaintiffs, claims against him of false arrest and false imprisonment cannot stand.  Further, defendant Cousette is protected by quasi-judicial immunity, because he arrested the plaintiffs in Byrd I pursuant to a facially valid court order issued by defendant Smith.  Accordingly, the claims in Byrd I against Jones and Cousette for false arrest and false imprisonment are due to be dismissed.

In Byrd II, the plaintiff alleges claims of false arrest and false imprisonment against all defendants.  However, Bridget Byrd was arrested and held in Michigan, and never was extradited to Alabama.  She was released from Washtenaw County Jail in Michigan ten days after her arrest there.  No defendant named in this lawsuit ever arrested or imprisoned the plaintiff in Byrd II.  To state a claim of Fourth Amendment violation under § 1983 for false arrest or false imprisonment, there must be an actual "seizure."  No defendant named in Byrd II ever "seized" Bridget Byrd for purposes of arrest or imprisonment, nor does the plaintiff allege that they did.  Accordingly, the claims of false arrest or false imprisonment in Byrd II cannot stand against any defendants, and are due to be dismissed.

For the same reason, Bridget Byrd's First and Ninth Amendment claims against Cousette are due to be dismissed.  There is no factual allegation that he did anything to interfere with Bridget's association with or custody of B.B.  He did not

execute the complaint against her or seek the warrant on which she was arrested by Michigan officials, and there is no allegation that he caused B.B. to be separated from Bridget Byrd.  Accordingly, Bridget Byrd's First and Ninth Amendment claims against Cousette are due to be dismissed.

### B. Qualified Immunity

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are through means that are within the official's authority to utilize.  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004), quoting Hill v. DeKalb Reg'l Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994). Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.  Harris v. Board of Education of the City of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).  Even so, qualified immunity does not apply in

those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law.  Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense.  Holloman, 370 F.3d at 1264.  The test is not, for example, whether the defendant had the authority to make an illegal arrest, but whether their jobs entailed making arrests, generally.  See id. at 1266.  In other words, the court does not ask whether the defendant had the right to illegally arrest the plaintiff, or swear out an illegal warrant,  but simply whether making arrests and swearing out warrants was within the general scope of the officer's duties.  The answer in the instant case is in the affirmative.

Once the defendant has met this burden, which the defendants in this case have, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.  Id.  To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  Id. at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

### i.    *Malicious Prosecution*

The § 1983 malicious prosecution claims in <u>Byrd I</u> and <u>Byrd II</u> must be discussed in terms of qualified immunity because, at the time that the defendants *sought* the arrest warrants commencing the criminal proceedings against the plaintiffs, they were not acting under the authority of a judge and, therefore, are not entitled to quasi-judicial immunity.   To determine whether the plaintiffs have adequately set forth a § 1983 claim of malicious prosecution, the court looks to both federal and state law.  The Eleventh Circuit Court of Appeals has stated:

> To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* in addition to the elements of the common law tort of malicious prosecution.  *See Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86; *Kelly*, 21 F.3d at 1553-55.  As to the constituent elements of the common law tort of malicious prosecution, this Court has looked to both federal and state law and determined how those elements have historically developed.  *Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86.  For example, in *Uboh*, this Court examined both federal law and Georgia law and indicated that, for purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution included: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused. 141 F.3d at 1004.  We note that these are also the same elements required under Alabama law for the tort of malicious prosecution. *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999).

Wood v. Kesler, 323 F.3d 872, 881-82 (11th Cir. 2003)(footnotes omitted), *cert. denied*, 540 U.S. 879 (2003) (italics in original), citing Uboh v. Reno, 141 F.3d 1000, 1002-04 (11th Cir. 1998); Whiting v. Traylor, 85 F.3d 581, 584 (11th Cir. 1996).

The plaintiffs in Byrd I and Byrd II allege that defendant Jones executed the complaint for the arrest warrant and swore that there was probable cause for the arrest.  Accordingly, the first prong for malicious prosecution (commencing a judicial action) applies only to defendant Jones, not defendant Cousette.  Because he swore out the arrest warrants, Jones meets the first prong of the common-law tort of malicious prosecution as to all plaintiffs.  Because the charges against all plaintiffs ultimately were dismissed, the third prong is met as well.  All plaintiffs allege that they were damaged by the arrest and subsequent proceedings.  Accordingly, prong four is met for the purposes of summary judgment.  The only remaining prong is whether defendant Jones swore out the arrest warrant with malice and without probable cause – the second prong of the common-law tort of malicious prosecution.

The Eleventh Circuit has comprehensively discussed the issue of probable cause in a § 1983 malicious prosecution claim in Carter v. Gore:

In *Malley v Briggs*, the Supreme Court established that even if a magistrate approves an arrest warrant, the officer who applied for the

warrant may be liable for violating the Constitution if the evidence presented to the magistrate was insufficient to establish probable cause. 475 U.S. at 345, 106 S. Ct. at 1098. Under this standard, however, the question is not whether probable cause actually existed; rather, the question is whether the officer had "arguable" probable cause. *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). Moreover, in order to defeat an officer's qualified immunity defense, the plaintiff must show that "a reasonably well-trained officer … would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Malley*, 475 U.S. at 345, 106 S. Ct. at 1098.

Specifically, this court has applied *Malley* to hold an officer liable where she secured an arrest warrant based on an affidavit that "articulate[d] neither the basis for her belief that [the suspect] violated the law nor any affirmative allegation that she had personal knowledge of the circumstances of [the] alleged crime." *Kelly*, 21 F.3d at 1555; *see also Garmon v. Lumpkin County*, 878 F.2d 1406, 1408-09 (11th Cir. 1989) (holding an officer liable where the affidavit states only that the suspect "did . . . commit the offense" because without "information providing the basis for the affiant's belief nor any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime," the "conclusory assertion clearly is insufficient to establish probable cause" (citations omitted)).

Carter v. Gore, 557 Fed. App'x 904, 908-09 (11th Cir. 2014).

The plaintiffs in Byrd I and Byrd II allege that arrest warrants were issued against them based solely on the Williamses' allegations that Lenora Williams was B.B.'s legal custodian and that the plaintiffs took B.B. without permission. An officer requesting a warrant is afforded qualified immunity even if the warrant causes an unconstitutional arrest, if the officer was "objectively reasonable" in

seeking the warrant.  <u>Malley v. Briggs</u>, 475 U.S. 335, 344, 106 S. Ct. 1092, 1098, 89 L. Ed. 2d 271, (1986).  "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost."  <u>Id.</u> at 345, citing <u>United States v. Leon</u>, 468 U.S. 897, 923, 104 S. Ct. 3405, 3421, 82 L. Ed. 2d 677 (1984).

Taking the facts in the light most favorable to the non-moving plaintiffs, defendant Jones requested the arrest warrants based on false and misleading statements the Williamses gave to the Tuscaloosa police.  Magistrate Smith issued the requested arrest warrants for felonious interference with custody.  Jones signed an affidavit swearing that Lenora Williams was B.B.'s legal custodian, and that statement was not true.  Jones could have contacted the Washtenaw County Probate Court in Michigan and discovered that Lenora Williams's guardianship of B.B. had been closed in 2006 when they left the State of Michigan.  A letter was sent to Lenora Williams from the Washtenaw County Probate Court, stating that Williams's guardianship would administratively close on July 5, 2006.  Because this letter was filed in the Michigan probate court, it was available for Jones to look at prior to seeking a warrant.  Jones did not have any court order or document from the State of Alabama showing that the Williamses were B.B.'s legal custodians.  At the preliminary criminal hearing for the plaintiffs, the court ordered

the officers to produce documents showing that Williams had custody of B.B. and, when the officers could not do so, the cases against the plaintiffs were dismissed.

Although the Motion for Summary Judgment, response, and reply do not include copies of the affidavits supporting the arrest warrants, the plaintiff in Byrd II, attached copies of the affidavits as exhibits to her complaint.  (Case No. 7:14-cv-1537-TMP, Doc. 1-1, pp. 2, 4-5).  The following statements were on Jones's affidavits submitted to support the issuance of the arrest warrants.  As to plaintiff Bridget Byrd he states, "[t]he defendant was driving the vehicle that left the scene where a co-defendant grabbed [B.B.] who is 10 years of age and ran to his vehicle and forced her into the car during a supervised visitation with the witnesses Samuel Williams and Lenora Williams who are the legal custodians of the child."  (Case No. 7:14-cv-1537-TMP, Doc. 1-1, p. 2).  As to plaintiff Gennie Byrd he states, "[t]he defendant held the door open for the co-defendant as he forced the child/victim ([B.B.]) into the vehicle.  The child is 10 years of age and was taken during a supervised visitation with the witnesses Samuel Williams and Lenora Williams who are the legal custodians of the child."  (Case No. 7:14-cv-1537-TMP, Doc. 1-1, p. 4).  And, as to plaintiff Lamond Byrd he states, "[t]he defendant grabbed [B.B.] who is 10 years of age and ran to his vehicle and forced her into the car during a supervised visitation with the witnesses Samuel Williams and Lenora Williams who are the legal custodians of the child."  (Case No. 7:14-cv-1537-

TMP, Doc. 1-1, p. 5).[15]   Jones does not claim to have personally witnessed the alleged interference with custody, but bases his statements on the assertions of the witnesses and his investigation.

In Carter v. Gore, 557 Fed. Appx. 904 (11th Cir. 2014), the Eleventh Circuit discussed why the facts set out by the plaintiff in that case were "sufficient to plausibly suggest that [the police officer] secured an arrest warrant without arguable probable case." Id. at 910.  The Court explained:

> Just as in *Kelly* and *Garmon*, Gore's affidavit contained only a conclusory assertion that the suspect committed a crime.  By listing specific steps taken to commit the crime, the assertion in Gore's affidavit is longer and more specific than was the assertion in *Garmon*, which simply stated that the suspect committed the alleged crime.  But Gore's affidavit was legally deficient in precisely the same way: it provided no evidence to support Gore's assertions, nor did Gore allege personal knowledge about the crime.  As in *Garmon*, a reasonable officer in Gore's position would have known that such a conclusory affidavit did not allege facts sufficient to establish arguable probable cause.
>
> In support of his allegation that Gore lacked arguable probable cause, Carter claims that Gore had a number of reasons to believe that Carter did not commit the crime and no proof that he did.  Without witnesses, photographic evidence, or any evidence placing Carter at the scene of the crime, what evidence did Gore have? . . .

Carter v. Gore, 557 Fed. App'x 904, 910-11 (11th Cir. 2014).

---

[15]   The version of events leading to the plaintiffs' arrests that is set out the in the affidavits is very different than what is asserted in the case at bar.  However, the precise details of the day B.B. was taken by the plaintiffs are not at issue.

Unlike the officer in <u>Carter</u>, the affidavits submitted by Jones referenced "the witnesses Samuel Williams and Lenora Williams."  The analysis in <u>Carter</u> does not suggest that an officer must have some evidence *other than* an eye-witness account to have arguable probable cause to swear out a warrant.  Because the standard is "arguable" probable cause, the fact it was later determined that Lenora Williams did not have custody of B.B. does not mean Jones did not have arguable probable cause, unless Jones had some reason not to believe the Williamses' assertion that they had lawful custody.  The plaintiffs argue that Jones should have investigated further to confirm that the Williamses had custody of B.B.  The plaintiffs state with no factual support at all that Jones "knew" the Williamses did not have custody of B.B. and signed the complaint affidavits anyway.  The plaintiff in <u>Byrd II</u> argues that, on July 3, 2012, before the affidavits were sworn, she provided the Tuscaloosa Police Department with documents reflecting that Lenora Williams's guardianship had been terminated.  She states that she spoke with defendant Cousette on July 5 and 6, at which time Cousette admitted that he knew B.B. had been living in Michigan for 4 years prior to the incident, he knew of the termination of guardianship, and he knew that Bridget Byrd was B.B.'s mother.

Jones, not Cousette, was the officer who swore out the arrest warrants. Because Cousette did not swear out the warrants, what he may have known is not

relevant to whether Jones had arguable probable cause to seek a warrant.  The plaintiff asks the court to require a full investigation into an alleged crime, *before* warrants are issued.  Such a requirement would be overly burdensome to police and dangerous to the public at large.  In this case, the statements of the witnesses in the police report were sufficient to give Jones arguable probable cause that a crime had been committed by the plaintiffs and justify his seeking a warrant.  The fact that the witnesses may have lied to Jones about their custodial claim does not mean that Jones lacked arguable probable cause unless he had some reason not to believe the truthfulness of what the witnesses told him.  The Eleventh Circuit has explained:

> "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing."  [Franks v. Delaware, 438 U.S. 154, 164-65, 98 S. Ct. 2674, 2674, 57 L. Ed. 2d 667 (1978) (emphasis in original)]. While this condition does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  Id. at 165, 98 S. Ct. 2674.  Thus, a police officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information.  See Malley v. Briggs, 475 U.S. 335, 346, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986); Cannon, 174 F.3d at 1285.  If "a reasonable police officer would have known that [the witness's] testimony was not just negligently false, but recklessly so," then [the officer] is not entitled to qualified immunity.  Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994).

Holmes v. Kucynda, 321 F.3d 1069, 1083 (11th Cir. 2003).  There is no evidence that Jones had any reason not to believe the statements made to him by the Williamses.  Because a reasonable officer investigating the complaint by the Williamses would have no reason to believe what they told him was false, Jones has qualified immunity from liability based on seeking the arrest warrants. Accordingly, the federal malicious prosecution claims in Byrd I and Byrd II, to the extent they are set out against Jones, are due to be dismissed.

Defendant Cousette's arrest of the plaintiffs in Byrd I does not constitute the commencement of a judicial action and, because it is not alleged that he otherwise was involved in seeking the arrest warrant, claims of malicious prosecution against him cannot stand.  All the federal malicious prosecution claims in Byrd I and Byrd II, as they pertain to defendant Cousette, also are due to be dismissed.

### ii.   *Interference with Associational and Parental Rights*

In Byrd II, Bridget Byrd alleges claims for interference with her First Amendment right of association (with B.B.) and interference with her fundamental right as a parent to the custody of her child.[16]  As already discussed above, there is no factual basis for finding that Cousette is liable for interfering with the Bridget Byrd's First Amendment associational rights or her fundamental right as a parent

---

[16]    Lamond and Gennie Byrd do not allege these claims in Byrd I, and thus the court will discuss any such claims with respect to Lamond and Gennie Byrd.

to the custody of her child.   First, Cousette was not involved in the arrest of Bridget Byrd by Michigan authorities.   Second, even if he were involved in her arrest, he remains entitled to absolute quasi-judicial immunity for carrying out the commands of the warrant.   An officer executing a facially valid arrest warrant has no obligation to question the magistrate's judicial decision to issue the warrant, and he is not liable for faithfully executing the warrant's command to arrest the subject of the warrant.

Investigator Jones also is not liable for interfering with these rights as he had arguable probable cause to seek the warrants.   Based on the information then possessed by Jones, none of the Byrds had any legal custodial right to B.B. and, indeed, had illegally deprived Lenora Williams of her custodial rights.   Even though this information turned out not to be true, an objectively reasonable officer possessing the same information as Jones would have had at least arguable probable cause to seek the warrants.   As such, Jones is entitled to qualified immunity from liability on these counts in Byrd II.

## C.  Denial of Due Process and Equal Protection

Because Officer Cousette and Investigator Jones are not federal officers, any invocation of the Fifth Amendment is meritless.   The claim for deprivation of due process and equal protection, if it exists at all against them, arises from the Fourteenth Amendment.   For the reasons already discussed, both Cousette and

Jones are entitled to qualified immunity, and for Cousette, absolute quasi-judicial immunity.  Furthermore, the Byrds received all the process to which they were due.  Arrest warrants were obtained and executed.  Ultimately, court procedures resulted in the dismissal of the charges against them.  Plaintiffs fail to identify any other procedural right to which they were entitled.

Insofar as they allege a denial of equal protection, they have not alleged that they were the victims of any arbitrary or invidious discrimination prohibited by the Fourteenth Amendment.  The essence of the equal protection clause of the Fourteenth Amendment is its prohibition against State and local governments exercising purposeful, invidious discrimination against citizens on the basis of "race, religion, national origin, or some other constitutionally protected basis." Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001); Damiano v. Florida Parole and Prob. Comm'n, 785 F.2d 929, 932–33 (11th Cir. 1986); Sweet v. Secretary, Department of Corrections, 467 F.3d 1311, 1318–1319 (11th Cir. 2006); Jones v. Thomas, 2014 WL 903313, at *1 (M.D. Ala. Mar. 7, 2014).  "To state an equal protection claim, a plaintiff must demonstrate that similarly situated persons outside his protected class were treated more favorably and that 'the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.'"  Watson v. Div. of Child Support Services, 560 F. App'x 911, 913 (11th Cir. 2014), quoting Sweet v. Sec'y, Dep't of

Corrections, 467 F.3d 1311, 1318–19 (11th Cir. 2006); see also Amnesty Int'l,

USA v. Battle, 559 F.3d 1170, 1180 (11th Cir. 2009).

In the instant case, Bridget Byrd does not allege any protected-class status or

that the actions against her were invidious or arbitrary.  She does not allege that the

reason a warrant was issued and executed for her arrest was purposeful

discrimination on the basis of her race, religion, national origin, or other suspect

classification.  Absent some factual allegation of invidious discrimination, her

equal protection claim is meritless.

### D.  42 U.S.C. § 1985

The plaintiff in Byrd II (Bridget Byrd) claims that the individual defendants

conspired with one another, in violation of 42 U.S.C. § 1985(3), to deprive her of

"due process and equal protection under the 14th Amendment, freedom of

association under the 1st Amendment, freedom against cruel and unusual

punishment, and the fundamental liberty interests associated with a parent's right

to rear and raise their children without undue interference."  (Case No. 7:14-cv-

01537-TMP, Doc. 1, ¶ 88).  The Complaint, however, fails to state facts sufficient

to support a claim under § 1985(3).

> The elements of a cause of action under § 1985(3) are: (1) a
> conspiracy; (2) for the purposes of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the

laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

Griffin v. City of Clanton, Ala., 932 F. Supp. 1359, 1371 (M.D. Ala. 1996), quoting Lucero v. Operation Rescue, 954 F.2d 624, 627 (11th Cir. 1992).

The plaintiff fails to put forth any facts alleging that a conspiracy existed and, therefore, fails to satisfy the first element required to support a claim under § 1985(3). The plaintiff states that the "[d]efendants conspired . . . [to] deprive Plaintiff of her constitution[al] rights," and that the "[d]efendants engaged in a conspiracy to directly or indirectly deprive Byrd of [her] fundamental liberty interest of rearing and raising her own child," but she does not support these statements with any factual allegations whatsoever. Her purely conclusory statements are not sufficient to support her claim, and, in her response to the Motion for Summary Judgment the plaintiff fails even to address her § 1985(3) claim. Because the plaintiff fails to meet the first prong of a cause of action under § 1985(3), her claims cannot stand against any defendant.

The plaintiff also fails to satisfy the second element required to support a cause of action under § 1985(3), because she fails to allege – even in the most cursory fashion – the required motivation for sustaining such a claim. "The second

element of the cause of action requires the Plaintiffs to make a showing that the Defendants' actions were motivated by a racial or other class-based invidious discrimination." Griffin, 932 F. Supp. at 1371, citing Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338 (1971). The Supreme Court of the United States determined that, although it is not explicitly stated in the statute, the legislative intent of § 1985(3) was that it be applied only in cases where deprivation of equal protection occurred due to the plaintiff's membership in a protected class.

> For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, 'that Congress has a right to punish an assault and battery when committed by two or more persons within a State.' Id., at 485. The constitutional shoals that would lie in the path of interpreting s 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, quoted supra, at 1797. The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

Griffin v. Breckenridge, 403 U.S. 88, 101-02, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338 (1971). The plaintiff does not assert, even in a conclusory fashion, that any of

the actions taken against her were motivated by racial animus or by animus toward another protected class, of which the plaintiff may be a member.  Therefore, her claim cannot stand.  The plaintiff's claim pursuant to 42 U.S.C. § 1985(3) is due to be dismissed against all defendants.

### E.  State Law Claims

Only the plaintiff in Byrd II pursues claims under Alabama state law. Accordingly, all claims discussed in this section can be found in Document 1 of Case Number 7:14-cv-01537-TMP.  The plaintiff in Byrd II asserts the following state law claims: intentional infliction of emotional distress (also known as the tort of outrage), false arrest, false imprisonment, defamation, malicious prosecution, negligent infliction of emotional distress, and felonious interference with custody. In response to the claims, the defendants Jones and Cousette argue they are entitled to state-agent and/or discretionary function immunity under Alabama state law.

### i. Discretionary Function Immunity

As state actors, defendants Jones and Cousette assert that they are entitled to immunity.  According to Alabama Code § 6-5-338(a), a police officer of any municipality in the state "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Id.  Discretionary functions have been deemed to be "those acts as to which there is no hard and fast rule as to the

course of conduct that one must or must not take, and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Moore v. Adams, 754 So. 2d 630, 632 (Ala. 1999), citing Wright v. Wynn, 682 So. 2d 1, 2 (Ala. 1996), and L.S.B. v. Howard, 659 So. 2d 43 (Ala. 1995). The Alabama Supreme Court has held that immunity applies to the conduct of officers in the effectuation of an arrest. See Ex parte City of Montgomery, 758 So. 2d 565, 570 (Ala. 1999).

In Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), the state supreme court set out a detailed test for determining when a state employee is entitled to immunity under § 6-5-338, and changed the focus of such immunity from whether the employee is engaged in a "discretionary function," to the specific provisions of the immunity articulated in Cranman. That restatement of state-agent immunity includes the provision that a state employee is entitled to immunity when "exercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons." 792 So. 2d at 205. Since Cranman, a peace officer's entitlement to immunity under § 6-5-338(a) is judged by the principles set forth in Cranman,

and not under an analysis of discretionary versus ministerial functions.[17]  Ex parte City of Tuskegee, 932 So. 2d 895, 904 (Ala. 2005).

The statutory immunity extends not only to the officers, but to the governmental unit that employs them.  See, e.g., Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003); Montgomery v. City of Montgomery, 732 So. 2d 305 (Ala. Civ. App. 1999) (holding that both the officer and the city were immune under § 6-5-338 for mistaken arrest of man).  The immunity shields the officers and the city from liability "unless [the] actions were conducted with willful or malicious intent or in bad faith."  Ex parte City of Montgomery, 758 So. 2d at 570.  Accordingly, the court evaluates a claim of discretionary function immunity by first determining whether the defendant has demonstrated that he was exercising judgment when the alleged wrongful conduct occurred.  If so, the burden shifts to the plaintiff to prove that the defendant acted in "bad faith, with malice or willfulness."  Wood v. Kesler, 323 F. 3d 872, 883 (11th Cir. 2003).[18]

---

[17]    It should be noted, however, that even before Cranman, the state courts recognized that discretionary functions were akin to those that required the exercise of judgment.  Ex parte City of Tuskegee, 932 So. 2d at 905, citing Ex parte City of Montgomery, 758 So. 2d at 569.

[18]    It has been noted that discretionary function immunity and qualified immunity both involve a "core issue" of whether a defendant violated clearly established law.  Qualified immunity, however, cannot be defeated by a showing of bad faith, malice, or willfulness. Scarbrough v. Myles, 245 F.3d 1299, 1303 n. 9 (11th Cir. 2001).

### (a).   *Intentional Infliction of Emotional Distress*

In Byrd II, the plaintiff claims that the defendants "intentionally or recklessly inflicted severe emotional distress" on the plaintiff, and that the conduct of the defendants was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community."  (Case No. 7:14-cv-1537-TMP, Doc. 1, ¶¶ 50-51).  The elements of the tort upon which the plaintiff must offer evidence are the following:

> "The tort or outrage requires that: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) . . . the distress was severe.  With respect to the conduct element, this court has stated that the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"

Thomas v. Williams, 21 So. 3d 1234, 1237-38 (Ala. Civ. App. 2008), quoting Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1988); see also American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980).  "[T]he tort of outrage is 'a limited remedy to be applied only in flagrantly egregious circumstances.'"  Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1988), quoting Turner v. Hayes, 719 So. 2d 1184, 1187 (Ala. Civ. App. 1997), aff'd in pertinent part, 719 So. 2d 1190 (Ala. 1998).

41

> The tort of outrage . . . is so limited that this court has recognized it in regard to only three kinds of conduct (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).  See also Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort Law*, § 23.0 (2d ed. 1996).
>
> *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).  This is not to say, however, that the tort of outrage is viable in only the three circumstances noted in *Potts*.   Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction.  *See O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011).  It is clear, however, that the tort of outrage is viable only when the conduct is " 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' "  *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010)(quoting *Inmon*, 394 So. 2d at 365).

Little v. Robinson, 72 So. 3d 1168, 1172-73 (Ala. 2011).

The plaintiff does not allege facts that propel the actions of Jones and Cousette to the level of outrageous conduct.  The plaintiff does not state what specific conduct she claims to be an intentional infliction of emotional distress, but she does incorporate by reference the fact portion of her complaint.  She asserts that: Jones and Cousette failed to confirm the Williamses' claims, Jones swore out

the arrest warrant for the plaintiff based on false and unsubstantiated information and without documents showing that Lenora Williams had custody of B.B.; Jones and Cousette's actions led to the plaintiff's arrest and imprisonment, caused the plaintiff's reputation to suffer, and caused her to experience emotional and mental trauma.  The plaintiff makes the baseless allegation that Jones and Cousette acted "in a malicious, reckless, grossly negligent and wanton manner," and that they "acted in concert to aid, abet and facilitate spurious felony charges" against the plaintiff.  (Case No. 7:14-cv-1537, Doc. 1, ¶¶ 23-28).  However, she makes no factual claims to support her statements.  The factual allegations that she does assert do not suggest conduct, even if proved, that was of such a nature that it is intolerable in civilized society.

The court already has determined that defendant Jones had at least arguable probable cause to seek the arrest warrant.  Further, Cousette was not involved in Bridget Byrd's arrest by Michigan authorities, but even if he was, he is entitled to quasi-judicial immunity for execution of the arrest warrant.  The court also has determined that the plaintiff failed to allege sufficient facts to support a claim of any sort of conspiracy.  The conduct in question does not fall into the categories for which the tort of outrage claim originally was intended.  It also does not rise to the level of conduct that can support a tort of outrage claim beyond those categories.  The Alabama Supreme Court has held that a police officer's failure to

comply with applicable rules, policies, and/or procedures does not fit within the category of "atrocious and utterly intolerable" behavior supportive of a viable outrage claim.  See Stabler v. City of Mobile, 844 So. 2d 555, 560-62 (Ala. 2002) (holding that a sergeant's transmission of libelous correspondence about a subordinate officer in an attempt to detrimentally impact that officer's ability to obtain a position with another law enforcement agency, while in violation of the internal rules of the Mobile Police Department, was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.") (quoting American Road Serv. Co. v. Inmon, 394 So. 2d 361, 368 (Ala. 1980)).

The plaintiff in the case at bar does not even claim that the defendant officers violated any applicable rules or policies of the Tuscaloosa Police Department.   Absent some factual showing that Jones and Cousette acted maliciously or beyond their authority, it cannot be said that they engaged in atrocious or outrageous conduct.  The plaintiff's claim of outrage against Jones and Cousette in Byrd II is due to be dismissed.

### (b). False Arrest and False Imprisonment

The plaintiff in Byrd II alleges state-law claims of both false arrest and false imprisonment against defendants Jones and Cousette.  Under Alabama state law, the claims of false arrest and false imprisonment may be used interchangeably.

See Kmart Corp. v. Perdue, 708 So. 2d 106, 110 (Ala. 1997) ("False arrest, or false imprisonment, consists of 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty.'  Ala. Code 1975, § 6-5-170.").  A wrongful or false arrest, therefore, supports an Alabama state law claim of false imprisonment.   Upshaw v. McArdle, 650 So. 2d 875, 878 (Ala. 1994).   Although Jones swore out the warrant that lead to the plaintiff's arrest, neither of the defendant police officers ever physically seized, detained, arrested, or imprisoned the plaintiff.  She was physically arrested by Michigan police on the basis of the Tuscaloosa County warrant.  "For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison."   Crutcher v. Wendy's of North Alabama, 857 So. 2d 82, 92 (Ala. 2003), citing Crown Central Petroleum Corp. v. Williams, 679 So. 2d 651, 653 (Ala. 1996).

Even assuming one of the defendants actually arrested the plaintiff, the defendants are entitled to quasi-judicial immunity, because the arrest took place pursuant to a court order.  See Ex parte Phelps, 612 So. 2d 1777, 1181 (Ala. 1992) ("Public officers carrying out judicial orders are normally entitled to quasi-judicial immunity."  Id. quoting International Molders & Allied Workers, AFL-CIO v. Buchanan Lumber Birmingham, 459 F. Supp. 950, 952 (N.D. Ala. 1978), *aff'd without opinion*, 618 F.2d 782 (5th Cir. 1980)).  Accordingly, the plaintiff's state

law claims of false arrest and false imprisonment are due to be dismissed against both Jones and Cousette.

### (c). Defamation

The plaintiff alleges that the defendants, on numerous occasions, "made false and malicious statements" about her.  (Case No. 7:14-cv-01537-TMP, Doc. 1, ¶ 71).  She claims that the statements "caused [her] to be shamed, ridiculed, held in contempt, lowered in the estimation of the community," caused her to lose her employment and standing, and damaged her reputation.  (Id. at ¶ 72).  Again, the plaintiff relies on her initial fact statement to support her defamation claim.  She alleges that the arrest warrant issued against her was based on the false statement that she, along with the plaintiffs in Byrd I, took B.B. during a supervised visitation.  She claims that Jones falsely swore out the warrant for her arrest, and did so in a reckless, harmful, grossly negligent and wanton manner.  (Id. at ¶¶ 21, 23).  The plaintiff argues that by applying for and issuing the arrest warrant, defendants Jones and Smith "supported and perpetuated the false reports," which caused the plaintiff "severe harm."  (Id. at ¶ 37).  The actions, the plaintiff alleges, resulted in her public humiliation when "the story of her arrest warrants, [sic] and arrest were published in numerous news articles and over the internet," and that the allegations caused her to be investigated by her employer.  (Id. at ¶¶ 38-39).

Alabama law recognizes four elements for a defamation claim.

> The elements of a cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the statement irrespective of special harm [(per se)] or the existence of special harm caused by the publication of the statement [(per quod)].

Jackson v. WAFF, LLC, 109 So. 3d 1123, 1126 (Ala. Civ. App. 2012), quoting

Dudley v. Bass Anglers Sportsman Soc'y, 777 So. 2d 135, 140 (Ala. Civ. App.

2000) (quoting Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So. 2d 1280, 1289

(Ala. 1993), quoting in turn McCaig v. Talladega Publ'g Co., 544 So. 2d 875, 877

(Ala. 1989)).

The plaintiff's claim cannot stand, however, because all of the

communications to which she objects are privileged under Alabama Code § 13A-

11-161, which states:

> The publication of a fair and impartial report of the return of any indictment, *the issue of any warrant, the arrest of any person for any cause or the filing of any affidavit*, pleading or other document in any criminal or civil proceeding in any court, or of a fair and impartial report of the contents thereof, or of any charge of crime made to any judicial officer or body, or of any report of any grand jury or of any investigation made by any legislative committee, or other public body or officer, *shall be privileged, unless it is proved that the same was published with actual malice*. . .

Jackson v. WAFF, LLC, 109 So. 3d 1123, 1126 (Ala. Civ. App. 2012), quoting

Ala. Code § 13A-11-161 (emphasis added).  The communications that the plaintiff

alleges were defamatory all fall within the purview of the privilege discussed in

§ 13A-11-161.   The issuance of the arrest warrant by Magistrate Smith is

privileged, and the completion of the affidavit by Jones seeking the arrest warrant

is privileged.  The plaintiff asserted the mere legal conclusion that the defendants'

statements were "false and malicious."  (Case No. 7:14-cv-1537-TMP, Doc. 1, ¶

71).   However, the plaintiff offers no factual allegations that either of the

defendants acted maliciously.   The plaintiff has failed to assert that any

nonprivileged statements were made by any defendant, and the plaintiff's state-law

defamation claim is due to be dismissed against all defendants.

### (d). Malicious Prosecution

A claim of malicious prosecution under Alabama law requires a showing of

"'(1) a judicial proceeding initiated by the defendant, (2) the lack of probable

cause, (3) malice, (4) termination in favor of the plaintiff, and (5) damage.'"  Moon

v. Pillion, 2 So. 3d 842, 845-46 (Ala. 2008), quoting Lee v. Minute Stop, Inc., 874

So. 2d 505, 512 (Ala. 2003) (quoting Cutts v. American United Life Ins. Co., 505

So. 2d 1211, 1214 (Ala. 1987)).  Malicious prosecution is "an action disfavored in

the law."  Id. quoting Mitchell v. Folmar & Assocs., LLP, 854 So. 2d 1115, 1117

(Ala. 2003).  "'The reason for such disfavor is clear: [P]ublic policy requires that

all persons shall resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge."'" Id., quoting Mitchell, 854 So. 2d at 1117.

The elements required to support a claim of malicious prosecution under Alabama law are virtually identical to those for a malicious prosecution claim brought pursuant to § 1983.  For the reasons discussed, *supra*, Jones had arguable probable cause to seek an arrest warrant against the plaintiffs.  The second and third prongs of a state law malicious prosecution claim cannot be met as the claim pertains to Jones.   Therefore, the plaintiff's claim of state law malicious prosecution is DISMISSED as to Jones.  Because Jones sought the arrest warrants for all of the plaintiffs, he is the only defendant that can be said to have initiated a judicial proceeding against the plaintiffs.   Therefore, the plaintiff's state law malicious prosecution claims cannot stand against any of the other defendants, and is due to be dismissed.

### (e). Negligent Infliction of Emotional Distress

The plaintiff argues that the defendants acted recklessly, outrageously, and in a grossly negligent manner.  She does not indicate what actions by the defendants support these allegations, other than to incorporate by reference the entire fact statement once again.   The court assumes she contends that the

defendant officers' seeking of an arrest warrant without conducting a full investigation into the custodial status of B.B. was reckless, outrageous, and grossly negligent.  The plaintiff alleges that the defendants' actions caused her to suffer "severe emotional trauma, increased anxiety and other serious symptoms which required therapy and treatment."  (Case No. 7:14-cv-1537-TMP, Doc. 1, ¶¶ 80-82).  Whatever actions the plaintiff believes constitute the negligent infliction of emotional distress, her claim cannot stand, because there is no cause of action for negligent infliction of emotional distress under Alabama state law.

The Supreme Court of Alabama has expressly stated that "there is no cause of action for the *negligent* infliction of emotional distress," the Court "has repeatedly stated that only intentional infliction of severe emotional distress is actionable."  Allen v. Walker, 569 So. 2d 350, 352 (Ala. 1990), citing Green Tree Acceptance, Inc. v. Standridge and El-Jay's, Inc., 565 So. 2d 38 (Ala. 1990); Busby v. Truswal Systems Corp., 551 So. 2d 322, 324 (Ala. 1989); Whitt v. Hulsey, 519 So. 2d 901, 903-04 (Ala. 1987); American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980) (emphasis in the original).  Accordingly, the plaintiff's claim of negligent infliction of emotional distress is due to be dismissed against all defendants.

### *(f). Felonious Interference with Custody*

Finally, the plaintiff Bridget Byrd asserts a civil complaint against the defendants for felonious interference with custody.  The Alabama Code allows for a civil action to be commenced by the injured party if the injury complained of amounts to a felony.  See Alabama Code § 6-5-370.  The plaintiff argues that the defendants committed an act equivalent to felonious interference with custody.  The Alabama criminal code defines felonious interference with custody as follows:

> (a) A person commits the crime of interference with custody if he knowingly takes or entices:
>
> > (1)  Any child under the age of 18 from the lawful custody of its parent, guardian or other lawful custodian. . .
>
> (b) A person does not commit a crime under this section if the actor's sole purpose is to assume lawful control of the child.
>
> The burden of injecting the issue is on the defendant, but this does not shift the burden of proof.
>
> (c) Interference with custody is a Class C felony.

Alabama Code § 13A-6-45 (1975).

The plaintiff argues that the defendants "feloniously injured the plaintiff by, among other things, making false statements, swearing out a false warrant, issuing said warrant, unlawfully incarcerat[ing] Byrd, and illegally remov[ing] the child from her custody.  Said actions resulted in an interference with custody as Byrd

was the sole legal custodian of the minor child at the time the child was illegally removed from her custody."   (Case No. 7:14-cv-1537-TMP, Doc. 1, ¶¶ 91-93). The Supreme Court of Alabama has explained that a plaintiff, to state a claim of interference with custody, must plead facts tending to show the following:

> (1) [S]ome active or affirmative effort by [the] defendant to detract the child from the parent's custody or service, (2) [that] the enticing or harboring [was] willful, [and] (3) [that the enticing or harboring was done] with notice or knowledge that the child had a parent whose rights were thereby invaded."

Anonymous v. Anonymous, 672 So. 2d 787, 790 (Ala. 1995) quoting 67A C.J.S. *Parent and Child* § 131, p. 513 (1978) (citing in turn Kipper v. Vokolek, 546 S.W. 2d 521 (Mo. Ct. App. 1977)).   None of the actions by Smith, Jones, or Cousette, fall into the definition of felonious interference with custody.

First, taking custody of B.B. for the purpose of returning her to the person who was believed to be her legal guardian falls into the category of "assuming lawful control of the child," and, therefore, does not constitute a crime under the Alabama criminal statute.  Even without the shield of subsection (b) the facts, as they were believed at the time, were that the plaintiff was not B.B.'s lawful custodian, and therefore would have no claim under § 13A-6-45.  Finally, the plaintiff has alleged no facts that B.B. was "enticed" or "harbored" by any defendants (with the possible exception of the Williamses, who are not a part of the

current motion).  The swearing of a complaint, the issuance of an arrest warrant, and the execution of the arrest warrant cannot be regarded as "enticing" or "harboring" the child for purposes of civil liability under the criminal statute.

Additionally, as to defendants Smith and Cousette, both are entitled to judicial or quasi-judicial immunity.  Smith did nothing more than act in her judicial capacity to issue an arrest warrant.  That act is entirely immune from civil liability. Likewise, Cousette can be alleged to have done nothing more than execute the arrest warrant (even though it was actually Michigan authorities that did so), and this is absolutely immune under quasi-judicial immunity.  Accordingly, the plaintiff's claim of a civil action pursuant to Alabama Code § 6-5-370 based on the violation of Alabama Code § 13A-6-45 is due to be dismissed.


**Municipal Liability**

The plaintiff in Byrd II names as defendants the City of Tuscaloosa ("the City") and the City of Tuscaloosa Police Department[19] ("the Department"), and alleges all claims set forth in her complaint equally against those defendants.  The plaintiffs in Byrd I also name the City (but not the Police Department separately)

---

[19]   A city's police department is not a legal entity subject to suit for purposes of § 1983 or under Alabama law.  See Higginbotham v. City of Pleasant Grove, 2013 WL 5519557 *6 (N.D. Ala. Sept. 30, 2013),citing Rule 17 of the Federal Rules of Civil Procedure; Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992); Ex parte Dixon, 55 So. 3d 1171, 1171-72 & n. 1 (Ala. 2010).  Accordingly, the claims against the Tuscaloosa Police Department by the plaintiff in Byrd II are due to be dismissed.

as a defendant and allege all claims in the complaint against the City.   The plaintiffs in Byrd I claim that the city of Tuscaloosa had a "pattern or practice of issuing felony arrest warrants based upon the sworn affidavit of its police officers without any supporting facts of probable cause."  (Doc. 1, ¶ 19).  The plaintiffs in Byrd I and Byrd II request punitive damages be awarded against the City.

### A.  Federal Claims

It is well-settled that a municipality cannot be liable for a constitutional tort under § 1983 unless the deprivation of the constitutional right occurred as a result of an official policy or custom of the governmental body.   See Monell v. Department of Social Services of New York, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  Moreover, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  Id. at 691.  The Eleventh Circuit Court of Appeals has further determined that a municipality may be liable under § 1983 for the actions of a police officer only when the city's "official policy caused the violation."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).

In order to survive summary judgment on the § 1983 claims, the plaintiffs must have come forward with evidence to show that the City had a policy – even if unwritten or informal – of having officers seek out arrest warrants without probable cause.  Other than making the blanket statement that the City "had a

pattern or practice of *issuing* felony arrest warrants based upon the sworn affidavit of its police officer without any supporting facts," the plaintiffs in <u>Byrd I</u> do not assert factual support for a claim against the City.  (Emphasis added).  Under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), however, this is a conclusion masquerading as a factual allegation. Even if it can be regarded as a factual allegation sufficient to allow the plaintiffs to conduct discovery on the question, the factual allegations in plaintiffs' own complaint make clear that the warrants in this case were *issued* not by any official of the City of Tuscaloosa, but by Rosina Smith, a magistrate with the Tuscaloosa County District Court.   Because these were *felony* arrest warrants, they were obtained from the district court, an agency of the State, not from the Tuscaloosa Municipal Court, which has jurisdiction only of misdemeanors.   Thus, it is clear that no policy of or practice by the City of Tuscaloosa was implicated in the *issuance* of the arrest warrants.

The plaintiff in <u>Byrd II</u> does not set out any *specific* claims against the City; she simply names the City as a defendant and brings all of her claims against all "defendants" generally.  In <u>Byrd II</u>, the plaintiff discusses the City only in terms of the case at bar.  She does not make any allegations or offer any evidence that the City has a pattern or practice of doing anything at all.  Because the plaintiffs in <u>Byrd I</u> and <u>Byrd II</u> fail to set forth sufficient *factual* allegations that the City has a

pattern or practice of doing anything improper, all federal claims against the City in both complaints are due to be dismissed.

### B. *State-Law Claims*

To the extent the plaintiff in <u>Byrd II</u> asserts her state law claims against the City, those claims, as well, are due to be dismissed. The state law claims alleged in <u>Byrd II</u> are as follows: malicious prosecution, intentional infliction of emotional distress, false arrest, false imprisonment, defamation, negligent infliction of emotional distress, and felonious interference with custody. First, a state law claim of malicious prosecution "cannot lie against a municipality, because a municipality cannot be deemed to act with malice." <u>Franklin v. City of Huntsville</u>, 670 So. 2d 848, 850 (Ala. 1995), citing <u>Neighbors v. City of Birmingham</u>, 384 So. 2d 113 (Ala. 1980). Secondly, "under the principles of vicarious responsibility, where the employee . . . had immunity, the municipality likewise had immunity." <u>Franklin</u>, 670 So. 2d at 851, citing <u>Gore v. City of Hoover</u>, 559 So. 2d 163 (Ala. 1990). This court already has found that Magistrate Smith,[20] Officer Cousette, and Investigator Jones are entitled either to judicial, quasi-judicial, or discretionary function immunity for the state law claims of false arrest, false imprisonment, and interference with custody. Therefore, to the extent any of these claims are alleged

---

[20]     Of course, as already explained, Magistrate Smith was an employee of the Tuscaloosa County District Court, not the City of Tuscaloosa. Whatever she did cannot be attributed to the City.

against the City, they are due to be dismissed.  The court also has determined that none of the allegations by the plaintiff in Byrd II rise to the level of *intentional* infliction of emotional distress, and that any communications alleged to be defamatory were privileged.  Therefore, these claims, to the extent they are asserted against the City, also are due to be dismissed.  Finally, there is no state law claim of *negligent* infliction of emotional distress.  So, any such claim that is brought against the City under state law also is due to be dismissed.

### C.  Punitive Damages

The plaintiffs in Byrd I and Byrd II assert that they are entitled to punitive damages against all defendants, including the City of Tuscaloosa.  To the extent that the plaintiffs seek such damages against the municipal defendant, those damages are unavailable as a matter of law.  See Kentucky v. Graham, 473 U.S. 159, 105 S. Ct. 2099, 87 L. Ed. 2d 114 (1985); City of Newport v. Fact Concerts, 453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) (A municipality may not be held liable for punitive damages in a § 1983 action).  Under Alabama law, punitive damages against a municipality are precluded by statute.  See Alabama Code § 6–11–26 (1975); Carson v. City of Prichard, 709 So. 2d 1199, 1205 (Ala. 1998).  Thus, as against the City, there is no possibility of the recovery of punitive damages under any theory.

## CONCLUSION

For the reasons set forth herein, the Motion to Dismiss by defendants Jones, Cousette, and the City, and later joined by Smith and converted into a Motion for Summary Judgment (doc. 17), is due to be GRANTED.  All claims in <u>Byrd I</u> and <u>Byrd II</u> against these four defendants are due to be DISMISSED WITH PREJUDICE.  A separate order of judgment will be entered contemporaneously herewith consistent with Rule 58.


**DONE** and **ORDERED** on May 11, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE